IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 22-24-CFC |
| MALIK J. MOSS and JACOB SANTIAGO, | |
| Defendants. | |

## MEMORANDUM

Defendants Malik Moss and Jacob Santiago pleaded guilty to conspiring to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846, respectively. D.I. 52 ¶¶ 1–2; D.I. 58 ¶¶ 1–2. At the parties' request, I held an evidentiary hearing to determine the weight and purity of methamphetamine attributable to Defendants for calculating their guideline ranges.

The government called two witnesses at the hearing: New Castle County Police Officer Trevor Riccobon and DEA Special Agent Jerwon Bethel. I found both Riccobon and Bethel to be credible.

The parties submitted extensive briefing before and after the hearing. I have reviewed carefully the briefing, the exhibits, and the wiretap transcripts submitted at the hearing and in connection with the briefing.

The government's investigation that led to Defendants' indictment initially focused on Moss. In June 2021, confidential informants made three controlled purchases of methamphetamine with a combined weight of four ounces from Moss.[1] The government wiretapped Moss's cell phone starting on September 30, 2021. The wiretap revealed that Moss and Santiago were working together and with others to buy and distribute crystal methamphetamine. The investigation ultimately showed that numerous individuals, including Tyrell Pankins, Roland LaPointe, Christina Chamberlain, Christopher Meadow, Jesus Alfaro, and Gerardo Rodriguez worked with Moss and Santiago to distribute various types of drugs.

The investigators conducted extensive visual and electronic surveillance of Moss, Santiago, and their co-conspirators. Undercover officers, for example, tailed members of Moss and Santiago's organization in cars, and the government tracked Moss's cell phone's location. After the investigation concluded, the government also obtained location data from Santiago's cell phone.

The investigators ultimately executed search warrants at the residences of Santiago, Pankins, Chamberlain, and LaPointe, and seized from those locations

---

[1] A confidential informant later made a fourth controlled purchase of methamphetamine from Moss. The confidential informant "asked for half a pound of crystal meth" and received from Moss "approximately 213 grams," which is about 13 grams less than half a pound. Tr. of Dec. 21, 2022 Hr'g 92–96.

2

over 1,800 grams of methamphetamine, smaller quantities of fentanyl cut with a horse tranquilizer, 40 pounds of marijuana, several firearms, and $20,000 in cash.

**Weight of Methamphetamine Attributable to Defendants**

The government asks me to determine the weight of methamphetamine attributable to Defendants under either of "two separate drug quantity theories." D.I. 111 at 1. Its first theory, which it calls the "Seizure Side," attributes to Defendants the methamphetamine seized by law enforcement agents at Pankins's and Lapointe's residences. D.I. 111 at 2. The second theory, which the government calls the "Reading Side," attributes to Defendants 15 pounds of methamphetamine that the government contends Defendants purchased from a supplier in Reading, Pennsylvania. D.I. 111 at 6. To avoid double counting (since it is conceivable that methamphetamine purchased in Reading could have been seized from Pankins's and/or LaPointe's residences) and because I find the evidence adduced by the government with respect to the Reading purchases to be compelling, I will not address the merits of the government's "Seizure Side" theory.

I find that Riccobon's testimony, the wiretap transcripts, and the exhibits submitted by the government establish by more than a preponderance that Moss and Santiago purchased in Reading 10 pounds of methamphetamine on or about

3

October 27–28, 2021 and five pounds of methamphetamine on November 11, 2021.

With respect to the October 27–28 purchase, I base that finding on: (1) Moss and Santiago's October 21, 2021 recorded call in which they discussed the possibility of buying 20 pounds of methamphetamine, Tr. of Dec. 21, 2022 Hr'g 60–69; D.I. 82, Ex. 6B at 11; (2) Moss and Santiago's October 27, 2021 recorded call in which they discussed buying five or 10 pounds of methamphetamine, Tr. 60–69; D.I. 82, Ex. 6F at 3, Ex. 13 at 3; (3) Moss and Santiago's trips to Reading on October 27 and 28, Tr. 69–74; D.I. 82, Exs. 10C, 10D, 11A; (4) Moss's series of text messages sent on the way back from Reading, broadcasting that he had "ice" (i.e., methamphetamine) for sale, Tr. 74–75; D.I. 82, Ex. 6F at 7–9; (5) Moss and Rodriguez's November 3, 2021 recorded conversation in which Moss stated that "Reading Pa" is "where the ice is" and that he "just went up there" and "bought 10 pounds of ice," D.I. 82, Ex. 6F at 10–12; *see* Tr. 77–80; and (6) the totality of the evidence (most of which is not disputed), which shows generally that Moss and Santiago were drug dealers who conspired to distribute various drugs, including methamphetamine.

With respect to the November 11, 2021 purchase, I base that finding on: (1) the evidence that Moss, Santiago, and Pankins travelled to Reading on that day, Tr. 81–86; D.I. 82, Ex. 6G at 6–8; D.I. 82, Exs. 10F, 10G, 11B; (2) Moss and

4

Santiago's November 12, 2021 recorded call during which Santiago confirmed that he and Moss had a total of five "pound traps" lined up to sell, D.I. 82, Ex. 6B at 16–23; *see* Tr. 86–88; and (3) the totality of the evidence (most of which is not disputed), which shows generally that Moss and Santiago were drug dealers who conspired to distribute various drugs, including methamphetamine.

### **Purity of Methamphetamine**

There is no direct or circumstantial evidence to establish by a preponderance that any of the methamphetamine seized by the government during its investigation came from the October 27–28 and November 11 purchases Moss and Santiago made in Reading. The purity levels of methamphetamine purchased directly from Moss on four occasions were 95%, 95%, 94%, and 62%. D.I. 82, Ex. 9 at 2, 3, 5, 6; Tr. 12–15, 92–96. The purity levels of the methamphetamine seized from Pankins's, Lapointe's, and Santiago's residences were 86%, 98%, and 94%, respectively. D.I. 82, Ex. 9 at 7, 8, 11. Affording Defendants lenity on this issue, I think it appropriate to apply the lowest known purity level of the methamphetamine associated with the entire conspiracy and therefore will apply a purity level of 62%.

                                                  _____
                                                  CHIEF JUDGE